MOBIL OIL CORPORATION *v.* ROBERT K. KILLIAN, ATTORNEY GENERAL

SUPERIOR COURT      HARTFORD COUNTY      FILE NO. 179115

88

Memorandum filed February 8, 1973

*Robinson, Robinson & Cole,* of Hartford, for the plaintiff.

*Gerard J. Dowling,* assistant attorney general, for the defendant.

SADEN, J. The plaintiff, Mobil Oil Corporation, has instituted this action to quash a subpoena duces tecum issued by the attorney general to obtain certain documentary information under chapter 624 of the General Statutes, the "Connecticut Anti-Trust Act" (§§ 35-24—35-44), in connection with Mobil's gasoline business in the state of Connecticut. The subpoena is set forth in footnote 1.

Mobil asserts the following reasons to quash: (1) The subpoena does not sufficiently "state the nature of the alleged violation" as required by

---

[1] "AMENDED SUBPOENA DUCES TECUM

To Mobil Oil Corporation, a New York corporation, duly authorized to do business in the State of Connecticut, whose statutory agent for service is C. T. Corporation System, 799 Main Street, Hartford, Connecticut.

By Authority of the State of Connecticut, and more particularly pursuant to Chapter 624 of the General Statutes, you are hereby required to submit the following documentary material to the At-

§ 35-42 but merely uses conclusory language alleging a conspiracy to control gasoline prices in Connecticut; (2) it fails to have an "affidavit or recitation" that the attorney general has reason to believe Mobil has violated §§ 35-24 to 35-43; (3) it is defective in paragraphs 1, 3, 4, 5, 9, 10, 11, and 12 for failure to describe the documentary material sought with definiteness and certainty so as to be accurately identified pursuant to § 35-42; instead, it improperly seeks by interrogatories to have Mobil extract and correlate information from its records and compile

torney General at his office, 30 Trinity Street, Hartford, Connecticut, on or before January 30, 1973, because of alleged conspiracy for the purpose of, or having the effect of, fixing, controlling, or maintaining prices and rates in the distribution and sale of gasoline in the State of Connecticut.

### DEFINITIONS

As used herein:

(A) 'Your Company' shall mean the company to which this subpoena is addressed, its parent, predecessors, subsidiaries, and affiliates in the United States.

(B) 'Gasoline' shall mean refined petroleum in a form suitable for use in automobiles.

(C) 'Trading Area' shall mean the State of Connecticut.

(D) 'List' shall mean a list showing the 'required documentary material' or, in lieu thereof, such documents as will show the names, dates, prices, zones, dealers, distributors, written criteria, maps and addresses required.

### SCOPE

Except where otherwise indicated, this subpoena covers the period from January 1, 1970 up to and including the date of service of this subpoena.

### DOCUMENTS TO BE PRODUCED

1. A list and geographical description of the boundaries of all price 'zones' or price areas of retail gasoline dealers selling your company's brand for the years 1970, 1971 and 1972.

2. Your 'tank wagon' price per gallon for the years 1970, 1971 and 1972:

(a) regular gasoline

(b) intermediate gasoline

(c) premium gasoline

3. A list of all retail dealers which receive or have received temporary voluntary allowances or so-called 'dealer aid' and the amount thereof per gallon to each in the calendar years 1970, 1971 and 1972.

4. For each retail dealer who received temporary voluntary al-

and supply lists and schedules which do not exist except as to paragraphs 3 and 4, where there are lists for a portion of Connecticut; (4) it is not limited to Connecticut but makes demands without geographic limitation, except for paragraph 9, without showing any relevancy to any alleged violation of Connecticut law; (5) it is an unreasonable search and seizure in violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution; (6) it is intended by the attorney general to gather information to form the basis of a federal antitrust suit to be brought by him and the attorneys general of other

lowances or so-called 'dealer aid,' list the time periods in each of said years during which the dealer received the temporary voluntary allowances or so-called 'dealer aid' and the amount per gallon of such temporary voluntary allowances or 'dealer aid' in said time periods.

5. A list of all retail dealers who asked for 'dealer aid' or T.V.A. and were refused, and the dates of said request and said refusal for the period beginning January 1, 1970, to the date of service of this subpoena.

6. The criteria used in establishing each of the aforesaid price zones for the years 1970, 1971 and 1972.

7. Any maps showing price zones or price areas, if available.

8. A list of all retail outlets, with address of each, selling your brand of gasoline.

9. The names and addresses of all dealer representatives of your company for the State of Connecticut.

10. A list of all distributors of your brand of gasoline who have received temporary voluntary allowances or discounts and the amount thereof per gallon to each in the calendar years 1970, 1971 and 1972.

11. For each distributor who received temporary voluntary allowances or discounts, list the time periods in each of said years during which the distributor received the temporary voluntary allowances and the amount per gallon of such temporary voluntary allowances in said time periods.

12. A list of all distributors who have received a transportation cost payment or allowance and the amount thereof per gallon to each in the calendar years 1970, 1971 and 1972.

13. For each distributor who received a transportation cost payment or allowance, list the time periods in each of said years during which the distributor received a transportation cost payment or allowance and the amount per gallon of such transportation cost payment or allowance in said time periods."

states against various oil companies, a use not authorized by § 35-42 and in violation of § 35-42 (c); (7) it is illegal because chapter 624 violates the separation of judicial and executive powers under the Connecticut constitution, because although denominated a "civil" statute it is in fact a criminal statute whose enforcement properly should be in the hands of the judicial branch through the state's attorney and not the executive branch through the attorney general.

The court will address itself to each of the seven numbered claims set forth above.

(1) A substantial portion of the Connecticut Anti-Trust Act is modeled, with some changes, after the federal Antitrust Civil Process Act of 1962, set forth in 15 U.S.C. §§ 1311–1314 (1970). General Statutes § 35-42 (b) requires the subpoena to "state the nature of the alleged violation." Here, the nature of the alleged violation is described as an "alleged conspiracy for the purpose of, or having the effect of, fixing, controlling, or maintaining prices and rates in the distribution and sale of gasoline" in Connecticut.

At first blush, Mobil's claim might seem superficially to have some validity. The short and terse statement describing the alleged violation does not specify the particular offense or offenses under investigation. But reflection convinces that the nature of the conduct must be stated in general terms. The whole purpose of the statute is to enable the attorney general to determine whether there has been a violation and then to frame a civil complaint based upon information obtained through the subpoena. To ask that the attorney general specify in advance the exact nature of Mobil's conduct which is prohibited by law is to require him to know in advance what he cannot know until the investigation is com-

pleted. As stated in *Petition of Gold Bond Stamp Co.*, 221 F. Sup. 391, 397, aff'd, 325 F.2d 1018, dealing with the identical attack under the federal act, "[n]ecessarily, therefore, the nature of the conduct must be stated in general terms. To insist upon too much specificity with regard to the requirement of this section would defeat the purpose of the Act, and an overly strict interpretation of this section would only breed litigation and encourage everyone investigated to challenge the sufficiency of the notice. . . . The test, however, must be whether the statement in the demand as to the nature of the conduct under investigation is sufficient to inform *adequately the person investigated and sufficient to determine the relevancy of the documents demanded for inspection.*" We need only add that one would have to assume a naivete on the part of Mobil of astounding proportions for the court to believe that the above description of the nature of the alleged violation does not suffice to inform Mobil that an alleged claim of price fixing or control of gasoline prices is the reason for the investigation.

The Connecticut statute must be interpreted liberally in view of all the circumstances, and so interpreted the description of the nature of the alleged offense here is sufficient compliance with the law.

The court therefore must reject Mobil's claim as to (1) above.

(2) The court must also reject (2) of Mobil's claims. Nothing in chapter 624 requires "an affidavit or recitation" that the attorney general has reason to believe Mobil has violated the statute. Unless established to the contrary, the very issuance of the subpoena under the statute clearly implies "reason to believe" a violation has occurred. § 35-42. Further recitation would serve no useful purpose.

(3) Here Mobil asserts a lack of certainty in the subpoena's description of documentary material sought and the impropriety of requiring it to extract and correlate information, and to prepare lists which do not exist except in part under paragraphs 3 and 4 of the subpoena.

The subpoena under "Definitions" sets forth some of its parameters and describes among them "list." The federal act defines "documentary material" as any "record." 15 U.S.C. § 1311 (1970). While our statute does not specifically define the phrase, the court can see no reason why the word "list" or the words "documentary material" should not be read to include records in whatever form they may exist without requiring Mobil to prepare lists which they do not normally keep in the normal course of business. Thus, where in paragraph 5 of the subpoena reference is to a list of dealers who sought or were refused "dealer aid," if no such lists exist, the information may be supplied in whatever documentary or record form it may appear in Mobil's files, such as, for example, correspondence. No specially prepared list need be produced at the behest of the subpoena. The same is true of paragraphs 9, 10, 11, and 12 of the subpoena.

The same attack made here by Mobil was put forth and rejected in *Material Handling Institute, Inc.* v. *McLaren,* 426 F.2d 90, 92. The fact that Mobil may not have the specific document or list demanded is not a sufficient objection. The court there said: "This claim is based on the tenuous distinction the . . . [plaintiff] would draw between possession of addressograph plates listing addresses of eligible nonmembers and the possession of a printed list. Because it possesses only addressograph plates, . . . [plaintiff] argues, it cannot be forced to produce a list. . . . [I]t would be a sub-

version of the [federal] Act's clear intent to allow
a business entity to insulate its records from ap-
propriate investigation by the use of modern in-
formation storage techniques."

Furthermore, a reading of the subpoena set forth
in footnote 1 discloses a sufficient definiteness and
certainty so as to be accurately identified as re-
quired by § 35-42 (b).

The court must therefore reject (3) of Mobil's
claims.

(4) Here again a reading of the subpoena clearly
establishes that the information sought relates solely
to the state of Connecticut. Mobil cannot seriously
contend that the subpoena is aimed to have national
scope. It refers to the trading area involved as
Connecticut (definition [C]) and refers again in
paragraph 9 to names and addresses of dealer rep-
resentatives for Connecticut. In any event, even
if the subpoena sought information covering in-
formation beyond Connecticut's borders, it would
be invalid to this extent and need not be answered.
The statute circumscribes the subpoena's reach to
the state of Connecticut.

(5) Mobil's next attack relates to the fourth
amendment to the United States constitution and
article first, § 7, of the Connecticut constitution, and
the claim of unreasonable search and seizure under
both. In support of this contention, Mobil concedes
it is in a difficult position because the criteria used
in federal and state decisions where subpoenas
duces tecum have in the past been quashed or modi-
fied are nonspecific until measured against the facts
of this specific subpoena. It urges, nevertheless,
for all the previous reasons advanced and discussed
above, plus the claim that it places an unreasonable
and oppressive burden upon Mobil requiring the

examination of large quantities of documents, etc., that the subpoena necessarily entails an unreasonable search and seizure.

The same claim was made in *Petition of Gold Bond Stamp Co.,* 221 F. Sup. 391, 396, and rejected. That decision carefully reviews the history of the federal act prior to its enactment. Mobil's position on this score, whatever validity it may have had under earlier federal cases, does not find support in cases such as *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186, 204, where the court recognizes the broad visitorial powers always exercised in England and here with reference to private corporations and rules (p. 209) that the requirement of reasonableness "comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, . . . this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."

While Mobil has not used the phrase "fishing expedition" in its thrusts at the subpoena, this constitutional attack clearly implies it. In terms of civil antitrust investigations it now has little or no efficacy, as indicated in *United States* v. *Morton Salt Co.,* 338 U.S. 632, 642, where the court rules that more recent views on this hackneyed phrase have been more tolerant of it than formerly under older decisions where civil administrative investigations are involved. Here the Connecticut statute, like the federal act, has virtually eliminated the "no fishing" signs where civil subpoenas under its aegis are issued. See also *Hyster Co.* v. *United States,* 338 F.2d 183, 186.

For this reason the constitutional attack made under (5) above cannot be sustained.

(6) Mobil next points to statements made by the attorney general at a public hearing in New Haven on October 11, 1972, that he intends to use the information gathered as the basis of a federal antitrust action to be brought by him and other attorneys general. Section 35-42 (c) provides that documents furnished under the subpoena must be held by the attorney general "or his designée" and "shall not be available to the public." [2]

At New Haven the attorney general spoke at some length and narrated his efforts to enlist the support of his colleagues in the forty-nine other states at their national convention last June. Hearings before a Subcomm. of the Joint Standing Comm. on General Law, p. 12 (Oct. 11, 1972). Mobil is concerned that the information solicited by the subpoena will not remain confidential as required by statutory language and will be made available abroad.

Under our statute, while the matter is in the civil investigative stage, no one is entitled to examine the documents or records except the attorney general and his designee. Insofar as the phrase "shall not be available to the public" requires interpretation, it includes everyone other than the attorney general and his designee. None of the information obtained by this subpoena is available for export to any other person during the civil investigative stage. Of course, if following completion of the investigation further civil action is taken by the attorney general under the statute, such information obtained by this subpoena and actually used as evidence in such civil proceedings shall no longer be subject to

[2] ". . . (c) all documents furnished to the attorney general, or his deputy, shall be held in the custody of the attorney general, or his designee, shall not be available to the public, and shall be returned to the person at the termination of the attorney general's investigation or final determination of any action or proceeding commenced thereunder; . . . ."

the constraint of § 35-42 (c) either in those proceedings or elsewhere because their use as evidence places the information in the public domain.

The attorney general testified that he had no present intention of disseminating any information obtained by this subpoena to any individuals outside of his own department. Lest his activity in this sphere with the National Association of Attorneys General place him now in any awkward position should he refuse or fail to exchange subpoenaed information with colleagues in other states, or with the United States department of justice, the court will and does order that no information obtained by this subpoena duces tecum shall be disclosed by the attorney general or his designees in any manner to any other person except his designee and such assistant designees as may be reasonably necessary to have custody of the records received during the period of civil investigation under the statute. However, once a civil action is later instituted, if it is, under the statute, so much of the documentary materials obtained by this subpoena as is actually placed into evidence shall no longer be protected by this civil investigative shield.

There is of course no presumption that the attorney general will abuse his powers (*Hyster Co.* v. *United States,* 338 F.2d 183, 186), but the above order will serve him in useful stead during his dealings with other attorneys general and will also serve to set at ease the legal flutterings that are now disturbing Mobil.

We must therefore reject Mobil's contention in (6) subject to the precautionary order entered above.

(7) The final challenge flung by Mobil is that chapter 624 violates the Connecticut constitution because it mixes the judicial and executive functions

of government. Mobil alleges that chapter 624 is a criminal rather than a civil statute and as such properly belongs in the hands of the judicial department and not the executive department represented by the attorney general. In other words, the state's attorney alone has criminal jurisdiction; the attorney general is limited in Connecticut to civil jurisdiction only.

The Connecticut Anti-Trust Act deals with the unlawful restraint of trade and declares illegal every contract, combination, or conspiracy to restrain or monopolize trade in the manner set out in the sections of the act. The enforcement of the act is placed in the attorney general's hands. Injunctive relief is available to the state or any person, including, but not limited to, a consumer injured by the illegal conduct. If the plaintiff prevails, reasonable attorneys' fees plus costs are awarded. Treble damages are also allowed to the state or any person, including, but not limited to, a consumer injured by the illegal conduct. Any final judgment other than a stipulation or consent decree approved by the court in any action instituted by the attorney general is prima facie evidence in any action brought for injunctive relief or treble damages. Then follows § 35-38,[3] which provides, in any action instituted by the attorney general, for a forfeiture to the state of not more than $5000 for violation of any of the previous statutes by any individual. "Any other person" held to have violated any of the provisions of the same statutes shall forfeit and pay to the state a civil penalty of not more than $25,000.

---

[3] "Sec. 35-38. CIVIL PENALTIES FOR VIOLATIONS. In any action instituted by the attorney general, any individual who has been held to have violated this chapter shall forfeit and pay to the state a civil penalty of not more than five thousand dollars. Any other person who has been held to have violated any of the provisions of this chapter shall forfeit and pay to the state a civil penalty of not more than twenty-five thousand dollars."

Reference to the legislative records of the House (14 H.R. Proc., pt. 9, 1971 Sess., pp. 4182–3 [June 1, 1971]) and the Senate (14 S. Proc., pt. 7, 1971 Sess., p. 3211 [June 7, 1971]) throws no light whatever upon the motivation, meaning, or intention of the act beyond what appears on its face.

The classic definition of a penal statute is one imposing punishment for an offense against the state; "and the expression 'penal statutes,' does not ordinarily include statutes which give a private action against a wrong-doer." *Plumb* v. *Griffin,* 74 Conn. 132, 134. Thus a statute which required a wrongdoer cutting trees on another's land without his permission to pay the injured party $2 for every tree of one foot in diameter and, for trees of greater dimension, three times their value besides the $2 was not a penal statute because the increased damages were not intended as punishment for an offense.

Whether a case is a criminal one is not to be determined from the form of the complaint and process alone. See *State* v. *Hall,* 86 Conn. 191, 193, where a grand juror or prosecuting officer preferred a complaint for neglect to pay a poll tax of $2 but the statute was nevertheless declared noncriminal even though the form of the complaint was criminal. The purpose of the statute was to collect the tax, not to provide a punishment. To the same effect is *In re Application of Clark,* 65 Conn. 17, 30, where a statute providing for jailing of a reluctant witness before grand jurors in a town conducting an investigation was held not to create a criminal offense. The same act, of course, may be both a crime and a tort, the former being an offense against the public pursued by the sovereign, and the latter being a private injury pursued by the injured party. 21 Am. Jur. 2d, Criminal Law, § 2.

In *State* v. *McCook,* 109 Conn. 621, 629, a statute which was in reality an. act seeking to provide the power of eminent domain had to be so construed although in form it purported to be an appropriation act, and, as the former, it was held invalid for failing to provide a means of determining just compensation.

Though the process in a bastardy action may be similar to that in a criminal case, the form of such process does not make the action for support a criminal one. *Hinman* v. *Taylor,* 2 Conn. 357, 360. On the other hand, *Francis* v. *Lewis,* 11 Conn. 200, 203, ruled that a proceeding under the statute relating to a refractory apprentice on a complaint of his master causing the arrest of the apprentice and a trial before two justices of the peace with a finding of not guilty was a criminal proceeding because it could provide no pecuniary or other redress to the master but instead led to thirty days in jail if the defendant was convicted.

Mobil asserts among other things that § 35-38, which provides for a "civil penalty" up to $5000 in one category of cases and $25,000 in another, transforms chapter 624 into a criminal statute because these "civil penalties" are payable to the state and are not redress for any private injury, as in a civil case. More than this, Mobil argues that the civil investigatory proceedings under § 35-42 are really a one-man grand jury designed, not for any administrative or rule-making purpose, but to "aid . . . imminent prosecutions." It points as proof to the language of § 35-42 restricting issuance of subpoenas duces tecum to investigations undertaken "prior to instituting any action or proceeding against" an alleged violator of chapter 624.

Upon this premise, says Mobil, the attorney general cannot be empowered to prosecute a criminal

statute because he is an executive officer of the state and not a member of the judicial structure, as is a state's attorney who alone has that power. Conn. Const. arts. II, IV § 1. The attorney general's duties do not encompass the criminal section, and in fact expressly exclude criminal jurisdiction. General Statutes § 3-125; *Adams* v. *Rubinow,* 157 Conn. 150, 163 n.4.

There can be little doubt in Connecticut that historically the prosecution of crime has always been within the province of the state's attorney, appointed as a judicial officer. Investigations of crimes have always been under judicial control, as in the regular grand jury or the so-called "one-man grand jury." § 54-47; see 2 Swift, Digest, p. 369 (1823). Any attempt to transfer criminal prosecutions to the attorney general must fail for reasons indicated. The legislature cannot confer such power upon the attorney general because of the separation of powers doctrine set forth in article second of the Connecticut constitution.

The court does not, however, view chapter 624 in the same light as does Mobil, nor does it believe that the overriding characteristics of the act as enacted originally make it essentially a criminal statute. In the first place, Mobil's logic that § 35-42 is to "aid . . . imminent prosecutions," because the statutory language restricts subpoenas to investigations "prior to instituting any action or proceeding against" a violator, goes awry when one considers the civil actions for injunctive relief and treble damages contemplated by other sections of the act. It is not necessary, at the present stage of litigation, to determine more than this, for reasons hereinafter indicated. Moreover, insofar as a substantial portion of chapter 624 (Public Acts 1971, No. 608) is concerned, it is modeled after the federal act cover-

ing antitrust civil process (15 U.S.C. §§ 1311–1314 [1970]), but with some portions deleted or modified. Thus the Connecticut act includes sections for civil suits by the state or any private party in the Superior Court, including injunctive relief, and treble damages for injury to business or property. General Statutes §§ 35-33, 35-34, 35-35. Section 35-44 specifically mandates that all actions brought under the act "shall be according to the statutes . . . pertaining to civil actions." Only when we reach § 35-38, dealing with civil penalties for violations, do we approach a statute which allows the state, through the attorney general, to collect a forfeiture of a "civil penalty" not exceeding $5000. A "civil penalty" not exceeding $25,000 shall also be forfeited to the state by "[a]ny other person"—than one sued by the attorney general—who is held to violate the act.

This section (§ 35-38) on "civil penalties" is in addition to § 35-35, allowing treble damages plus counsel fees to the state or to any person injured in its business or property by any violation of the act, and to § 35-34, allowing injunctive relief plus counsel fees. The latter two sections of the act are cast in language of a remedial nature such as is commonly present in all civil statutes redressing a private wrong based upon proved damages. But § 35-38 is of a different character and stands apart from being a section designed solely to be remedial in character. As we shall see, this fact, however, is not determinative of the issue raised by Mobil, which challenges not merely § 35-38 as a criminal section of the statute but the entire chapter 624, which derives from Public Acts 1971, No. 608.

As for the analogy of the one-man grand jury to § 35-42, which therefore, it is argued, properly should be left to the bailiwick of the state's attorney,

it is interesting to note in passing the exact reverse argument in *Hyster Co. v. United States,* 338 F.2d 183, 186. While it is to a limited extent properly analogized, all methods seeking disclosure of information under civil rules of procedure might similarly be categorized to the same limited extent. But even if we were to agree arguendo to a greater degree than we do, a civil precomplaint procedure is not necessarily to be condemned. The experience of the antitrust division of the United States department of justice has disclosed that the use of a grand jury, regular or one-man, to obtain such information was unsatisfactory and in fact had been held to be an abuse of process where there was no intention to bring a criminal action. *United States v. Procter & Gamble Co.,* 356 U.S. 677. And finally, for this and other reasons Congress enacted the Antitrust Civil Process Act of 1962, 15 U.S.C. §§ 1311–1314 (1970). See *Petition of Gold Bond Stamp Co.,* 221 F. Sup. 391, 393, for historical background.

Furthermore, the concept itself is not unique and has been enacted in at least seventeen states besides Connecticut. See *Petition of Gold Bond Stamp Co.,* supra, 394.

Thus, reading chapter 624 as a whole, as we must, to determine whether it is civil rather than criminal in nature, we must conclude that, but for the possible exception of § 35-38, it must be construed as a civil statute whose dominating character is to provide a means of civil redress as well as investigatory tools for use by the attorney general.

The court does not intend to rule on the efficacy or nature of § 35-38 because it is not necessary for the disposition of this case. No attempt is here being made by the attorney general, any individual, or the state to impose a "civil penalty" on any violator by

virtue of § 35-38. Therefore, until such a case arises for the court's determination, we need not reach the question whether § 35-38, standing alone, is a criminal statute. Certainly, its language and intent are curious, but unimportant here. Cf. *United States* v. *E. I. du Pont de Nemours & Co.,* 366 U.S. 316, 326.

The reason for the court's position on this point is simply this: We can assume for the purpose of argument, without conceding it to be true, that § 35-38 is a criminal statute beyond the scope of the attorney general's powers under the Connecticut constitution. Its presence in chapter 624 as a part of Public Acts 1971, No. 608, does not vitiate the remainder of the act, none of which is tinged with the fatal essence of a criminal nature as claimed by Mobil. The doctrine of severability applicable by statute (§ 1-3) and by statutory construction makes it patent that the deletion of § 35-38 from consideration with the other sections of chapter 624 (Public Acts 1971, No. 608) will in no manner wrench its meaning or intent into a distorted posture. It is the duty of the court to sustain legislation unless its invalidity is beyond a reasonable doubt, and if two parts of an act are not so mutually connected with and dependent upon each other as to indicate a legislative intent that they should stand or fall together, it is proper to hold an act valid as to all of its parts except one, and as to that one, to hold it invalid. *Amsel* v. *Brooks,* 141 Conn. 288, 300; *State* v. *Wheeler,* 25 Conn. 290, 299.

Applying this rule of interpretation to chapter 624 makes inevitable the result just expounded. Section 35-38, if deleted, cannot, by any imaginary stretching, be construed as causing the collapse of the entire act. Its presence or absence in the act is for all practical purposes immaterial as far as

the other sections of the act, providing for injunctive or treble damages relief to litigants, are concerned, and particularly it carries no significance whatever insofar as § 35-42, which is the essence of the instant case, is involved. Under these circumstances, having found that § 35-38 is not vital to the viability of chapter 624, we can eliminate it from our consideration here. *El Paso & N.E. Ry. Co.* v. *Gutierrez,* 215 U.S. 87, 96; 16 Am. Jur. 2d, Constitutional Law, §§ 191, 182.

For reasons set forth, Mobil's challenge in (7) is rejected.

Judgment may enter in favor of the defendant in accordance with the above memorandum, but with the precautionary order as to (6) as part of the judgment.