[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED JUNE 3, 1997
This case arises out of the death of Shibani Abbhi, a nine year old child who suffered a fatal anaphylactic reaction to peanuts within two hours of having eaten a Danish pastry product on October 21, 1994. The plaintiffs include Deepak Abbhi, administrator of the child's estate, and Seema Abbhi, Shibani's mother.
The plaintiffs allege that the Danish was manufactured by the defendant Peschell Cake Pastry, Inc., labeled and distributed by the defendant AMI, and sold to the public by the defendant, Food Mart-Cos Cob, Inc. They claim that Shibani's injuries and death were caused by "peanut proteins, and/or some form of peanut product" contained in the Danish but not identified on the product label. In Counts One, Four and Seven, the estate makes claims pursuant to the Connecticut Product Liability Act, C.G.S. § 52-572m et seq. against AMI, Peschell Cake Pastry, Inc. ("Peschell") and Food Mart, Cos Cob, Inc.("Food Mart"), respectively. In Counts Two, Five and Eight the estate makes claims pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), § 42-110a et seq., against AMI, Peschell and Food Mart. Counts Three, Six and Nine are brought by Seema Abbhi against the same three defendants, respectively, and allege bystander emotional distress.
Counts Ten through Twenty-one are against Anthony P. Redmond, M.D. ("Redmond"), Allergy and Clinical Immunology Associates, P.C. ("Allergy"), Henry Harris, M.D. ("Harris"), and the Pediatric Centers P.C. ("Pediatric"). The estate alleges that each of these defendants committed medical malpractice in the care and treatment of the decedent relative to her known allergy to peanuts and/or peanut byproducts (Counts Ten, Eleven, Twelve and Thirteen). Seema Abbhi also makes bystander emotional distress claims against each of these defendants (Counts 14, 15 and 16 and 17). Finally, Seema Abbhi also makes claims alleging negligent infliction of emotional distress against each of these CT Page 6169 defendants (Counts 18, 19, 20 and 21).
The defendants have now moved to strike certain counts of the Third Revised Complaint. Peschell, AMI and Food Mart have moved to strike the CUTPA counts as well as the claims of bystander distress made against them. They have not challenged the Product Liability counts in this motion. Redmond, Allergy, Harris and Pediatric, while not challenging the malpractice claims asserted on behalf of the estate, have each moved to strike the bystander distress and negligent infliction of emotional distress counts brought by Seema Abbhi.
"The purpose of a motion to strike is to `contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted.'" NovametrixMedical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 214-15,618 A.2d 25 (1992). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint." Id., 215. "The court must construe the facts in the complaint most favorably to the plaintiff." Id. The motion "admits all facts well pleaded."Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432 (1989). A motion to strike "does not admit legal conclusions or the truthor accuracy of opinions stated in the pleadings." (Emphasis in original.) Mingachos v. CBS, Inc., 196 Conn. 91, 108,491 A.2d 368 (1985). Further, the court must construe the facts in the pleadings which are the subject of the motion to strike in the light most favorable to the pleader. Gordon v. Bridgeport HousingAuthority, 208 Conn. 161, 170, 544 A.2d 1185 (1988).
The following factual allegations, taken from the Third Revised Complaint, are pertinent to the resolution of the instant motions to strike:
Shibani Abbhi, who was nine years old at the time of her death, was known to have a serious peanut allergy as well as asthma, placing her at high risk for a serious, even fatal, anaphylactic reaction to peanuts. She had been under the care of the defendants, Anthony P. Redmond, M.D. and Allergy and Clinical Immunology Associates, P.C., who were her allergists. as well as the defendants Henry Harris, M.D. and The Pediatric Center, P.C., who were her pediatricians. The plaintiff and mother of the decedent, Seema Abbhi, had consulted with these physicians to obtain advice and instruction concerning the management of Shibani's conditions. The plaintiffs claim that the defendant physicians failed to prescribe medication necessary to counter an CT Page 6170 anaphylactic reaction and failed to properly advise, instruct and warn both Seema and Shibani concerning the seriousness of this condition and its proper management.
On October 21, 1994, Shibani was playing at a friend's house where she ate a Danish pastry product which was manufactured by the defendant Peschell Cakes Pastry, Inc., distributed by the defendant AMI and sold to the public by the defendant Food Mart-Cos Cob, Inc. Although the defendant Peschell utilized peanuts as an ingredient in this product, the label on the package, which was generated by the defendant AMI, did not list peanuts as an ingredient.
As a result of her ingestion of the Danish, Shibani suffered a violent anaphylactic reaction while her mother was driving her home from the friend's house. The plaintiff, Seema Abbhi, saw her daughter struggle for air, suffocate and ultimately die, thus causing her severe emotional distress. Seema alleges that because she had been improperly informed as to Shibani's condition, and because the proper medication had not been prescribed, she was unprepared to prevent or respond to her daughter's reaction, and that this also produced severe emotional distress.
In the several motions to strike filed by the various defendants, four categories of counts are the subject of claims that they fail to state claims upon which relief may be granted as a matter of law. These include 1) the CUTPA counts brought against the product liability defendants (Peschell, AMI and Food Mart); 2) the bystander distress counts against the product liability defendants; 3) the bystander distress counts against the malpractice defendants (Redmond. Allergy, Harris and Pediatric); and 4) the negligent infliction of emotional distress counts brought against the malpractice defendants. Because several defendants are involved in each category, the most convenient approach to the resolution of the various motions is to address each of the four categories in turn.
 I. THE CUTPA COUNTS AGAINST THE PRODUCT LIABILITY DEFENDANTS:
The CUTPA counts (Counts 2, 5 and 8) allege that the same course of conduct that forms the basis for the product liability counts also violates the Connecticut Unfair Trade Practice Act. The motions to strike these counts contend, first, that a wrongful death action cannot form the basis of a CUTPA claim; CT Page 6171 second, that the single act at issue in this case, the failure to properly label the product ingested by the decedent, cannot rise to the level of an unfair trade practice, and that, therefore, the facts alleged are insufficient to support a CUTPA claim; and third, that a CUTPA claim may not be brought in conjunction with a product liability claim because the Connecticut Product Liability Act provides the exclusive remedy for claims based on defective products.
A. Wrongful Death Actions Under CUTPA
At common law, the right of action for an injury to a person was extinguished by the death of the injured person. Flynn v. NewYork, N.H. H.R. Co., 111 Conn. 196, 201 (1930). This rule was abrogated by the Survival of Actions Statute, § 52-599, which states that "a cause or right of action shall not be lost or destroyed by the death of any person, but shall survive in favor of or against the executor or administrator of the deceased person." However, the statute specifically states that civil actions upon a penal statute do not survive the death of the injured person, C.G.S. § 52-599 (c), and the defendants contend that CUTPA is a penal statute.
The defendants find support for their contention in State v.Leary, 217 Conn. 404, 416 (1991), but the dictum in that case should not be taken as definitive. In State v. Leary. the Supreme Court did not rule directly on whether or not CUTPA is a penal statute. Rather, the claim upon which it was ruling was whether or not CUTPA is unconstitutionally vague and overbroad, an issue which the court determined it could not decide because the record was insufficient. Id. In dictum, the Supreme Court, citing Statev. Pickering, 180 Conn. 54, 59-60, 420 A.2d 322 (1980), noted that "a penal statute must be sufficiently definite to enable a person to know what conduct he must avoid." Id.
To the extent that the Court "implied" that CUTPA is a "penal" statute, however, this implication contradicts the legislature's stated intent that CUTPA should be "remedial." Section 42-110b(d) of the Unfair Trade Practices Act states: "It is the intention of the legislature that this chapter be remedial
and be so construed."
"The fundamental objective of statutory construction is to ascertain and give affect to the apparent intent of the legislature." Warkentin v. Burns, 223 Conn. 14, 20, 610 A.2d 1287
CT Page 6172 (1992). "If the language of a statute is plain and unambiguous, we need not look beyond the statute, because we assume that the language expresses the intention of the legislature." Rhodes v.Hartford, 201 Conn. 89, 93, 513 A.2d 124 (1986). Furthermore, because the reference by the court in Leary was not necessary to any determination made by it, it was dictum and not fully authoritative. See, Winslow v. Lewis Shephard, Inc.,212 Conn. 462, 468, 562 A.2d 517 (1989).
Remedial statutes and penal statutes are fundamentally different in their purpose and in their construction. A penal statute imposes punishment for an offense against the State, and ordinarily does not provide a private action against a wrong-doer. See, Mobil Oil Corporation v. Killian, 30 Conn. Sup. 87,301 A.2d 562 (1973), citing Plumb v. Griffin, 74 Conn. 132, 134,50 A. 1 (1901). Such statutes should be narrowly construed. "We are [also] mindful of well established principles that govern the construction of penal statutes. `Courts must avoid imposing criminal liability where the legislature has not expressly so intended.'" State v. Harrell, 238 Conn. 828, 832 (1996), quotingState v. Breton, 212 Conn. 258, 268-69, 562 A.2d 1060 (1989). "Accordingly, `[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant.'" Id.,
quoting State v. Jones, 234 Conn. 324, 340, 662 A.2d 1199 (1995);State v. Brown, 235 Conn. 502, 517, 668 A.2d 1288 (1995); Statev. Hinton, 227 Conn. 301, 317, 630 A.2d 593 (1993).
Remedial statutes, in contrast, provide "a remedy enforceable by an individual in a civil action that allows the recovery of damages in an amount commensurate with the injuries suffered."Pierce v. Albanese, 144 Conn. 241, 250, 129 A.2d 606 (1957). Such statutes are to be liberally construed in order to promote the achievement of its manifest purpose. See, Merchants Bank TrustCompany v. Pettison, 112 Conn. 652, 655, 153 A. 789 (1931). The Connecticut Unfair Trade Practices Act was passed in an attempt to promote honesty and full disclosure in the conduct of business, Bailey Employment System, Inc. v. Hahn, 545 F. Sup. 62, (D.Conn 1982), affirmed 723 F.2d 895., and should be liberally construed, Murphy v. McNamara, 36 Conn. Sup. 183, 416 A.2d 170
(1979).
The defendants also cite Touchette v. Smith, 10 CONN. L. RPTR. 173 (1993), a Superior Court case, which, utilizing the dictum in State v. Leary, held that CUTPA is a penal statute and CT Page 6173 that actions brought pursuant to it therefore abate at death. The court in Touchette, however, did not address the specific language of Section 42-110b(d), which terms it a remedial statute. Moreover, the court acknowledged "the possibility that the Appellate or Supreme Court might find that while the Connecticut Unfair Trade Practices Act is a penal statute for purposes of constitutional review, it is not a penal statute for purposes of the survival of actions statute." Id.
Indeed, a statute can have penal components but still be primarily remedial. See, Pierce v. Albanese, supra, at 249. There, the Supreme Court held that the Dram Shop Act, while penal in one sense, was intended by the legislature to be primarily remedial and that a liberal construction should apply. Id. Even if some aspects of the Connecticut Unfair Trade Practices Act are deemed to involve "penalties," it is clear that the legislature intended it to be remedial and liberally construed.
To allow recovery under CUTPA to a victim who suffers injury, but not where the victim suffers death, seems contrary to "established practice," as well as to a "common sense of Justice." See, Porpora v. New Haven, 122 Conn. 80, 187 A. 68
(1936) (claim under defective highway statute, while penal in nature, not extinguished at death). To read CUTPA so as to preclude a claim based on the fortuity of death would be contrary to the statute's remedial purpose. The CUTPA counts are therefore not subject to being stricken based on the death of Shibani Abbhi.
B. Sufficiency of Factual Allegations
Next, the defendants argue that the factual allegations in this case are legally insufficient to support CUTPA relief. They cite the focus on the mislabelling of the product and the absence of any allegation that the defendant's conduct was immoral, unethical, oppressive or unscrupulous, or that the plaintiff sustained an ascertainable loss.
The defendants first contend that the only allegation against them is an isolated act of negligence in labeling. They point toJacobs v. Healey Ford-Subaru, 231 Conn. 707, 652 A.2d 496 (1995), in which the court held that the single isolated incident of misrepresentation in that case was insufficient to maintain a CUTPA claim. "The repossession in issue appears to have been an isolated instance of misrepresentation by the defendant of its CT Page 6174 obligations due to the unique circumstances of this particular case, as distinguished from unfair or deceptive acts or practices in the defendant's trade or business." Id. at 729. The court went on to caution, however, that the "question of whether an action or practice can be the basis of a CUTPA action depends on all the circumstances of the particular case." Id. at 726.
Trial courts addressing the issue of whether a single act of negligence can form the basis of a CUTPA count have reached differing conclusions. See, e.g. Anzellotti v. The NationalAmusements, 1996 WL 107036 (Conn.Super., Hennessey, J.), citing,Chernet v. Town of Wilton, 2 CONN. L. RPTR. 475 (Sept. 19, 1990, Cioffi, J.); Dowcom, Inc. v. Cutak Rock, 17 CONN. L. RPTR. 151, 1996 WL 367785 (Conn.Super., Handy, J.), citing, Gersich v.Enterprise Rent-A-Car, 1 Conn. App. 1387 (U.S.D.C., Dec. 18, 1995, Nevas, J.); Sarat v. Waterbury Donuts, Inc., 1994 WL 185601;Zettergren v. New Britain General Hosp., Superior Court, J.D. of Hartford/New Britain at New Britain, Docket No. 465253 (June 30, 1995, Stengel, J.); Morgan v. Tolland Cty. Health Care, Superior Court, J.D. of Hartford/New Britain at Hartford, Docket No. 95469204S, 16 CONN. L. RPTR. 294 (Feb. 9, 1996, Handy, J.);Biondi v. Ste. Lazar Holdings, Inc., Superior Court, J.D. of Tolland at Rockville, Docket No. 9456419S (Feb. 16, 1995, Sferrazza, J.); Koehm v. Kuhn, 41 Conn. Sup. 130 (1987).
Construing the CUTPA counts in the light most favorable to the plaintiffs, however, the court does not find that they allege only a single act of negligence. To the contrary, they allege a pattern and practice of mislabelling the product in question over an extended period of time, with the result that the public at large has been deceived.
In determining whether or not allegations state sufficient facts to constitute a violation of the Connecticut Unfair Trade Practices Act, our courts have employed the "Cigarette Rule" first developed by the Federal Trade Commission. Normand JosefEnterprises v. Connecticut National Bank, 230 Conn. 486, 522,646 A.2d 1289 (1994). Whether or not a business practice is unfair or deceptive is judged by:
 (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some CT Page 6175 common law, statutory or other concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or businessmen]. Id., citing Conaway v. Prestia, 191 Conn. 484, 492-93, 464 A.2d 847 (1983).
The FTC and courts interpreting unfair trade practice statutes and regulations do not require that all three prongs be met to determine that a practice is unfair. Id. at 523. A violation of CUTPA can be demonstrated by actual deceptive practices or by conduct which violates public policy. Id.
Moreover, an intent to deceive need not be established. Id.,
citing Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80,105-06, 612 A.2d 1130 (1992).
The plaintiff's CUTPA allegations assert that the defendant engaged in behavior which was false and deceptive to the public and which violated the public policy which promotes truthful and accurate dissemination of information to the consuming public. This satisfies the first prong of the "Cigarette Rule," which requires only that there was a deceptive practice or a practice which violates public policy. Prishwalko v. Bob Thomas Ford,33 Conn. App. 575, 585, 636 A.2d 1383 (1994), quoting Web PressServices Corp. v. New London Motors, Inc., 203 Conn. 342,525 A.2d 57 (1987). Moreover, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id. at 585, quoting CheshireMortgage Service, Inc. v. Montes, Judicial District of 223 Conn. 80, 105,612 A.2d 1130 (1992) (emphasis added). See also, Geissler v. Ford MotorCo., supra, Geib v. Osh Kosh Truck Corp., 11 CONN. L. RPTR. 285,1994 Ct. Sup. 3478 (April 4, 1994, Dean, J.).
The defendants maintain that the plaintiffs have made no specific allegation that the conduct of the defendants was immoral, unethical oppressive or unscrupulous, the elements of the second prong of the "Cigarette Rule." Such an allegation may be unnecessary, however, where an actual deceptive practice or violation of public policy can be shown. See generally,Prishwalko, supra.
Finally, the defendants also assert that the CUTPA claim fails because the third prong of the "Cigarette Rule," substantial injury, has not been shown. Connecticut General Statutes, Section 42-110g(a) provides in relevant part that CT Page 6176 "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of the [prohibited] method, act or practice . . . may bring an action . . . to recover actual damages." The Connecticut Supreme Court defined "ascertainable loss" and "money or property" inHinchcliffe v. American Motors. Corp. 184 Conn. 607, 614-15, 440 A.2d (1991):
 Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known . . . To satisfy the "ascertainable loss" requirement, a plaintiff need prove only that she purchased an item partially as a result of an unfair deceptive practice or act and that item is different from that for which she bargained. This approach is in keeping with the remedial aims of the statute . . .
The plaintiff in this case has alleged that an item purchased as a result of a deceptive practice was different from what was bargained for, resulting in the death of Shibani Abbhi. In evaluating the three prongs of the "Cigarette Rule," the Federal Trade Commission determined that "unjustified consumer injury" was the most important factor and the primary focus of the FTC Act. A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200,216, 579 A.2d 69 (1990), citing D. Rice, Consumer Unfairness at the FTC: Misadventures in Law and Economics; 52 Geo Wash. L. Rev. 1, 4 (1983), quoting letter from FTC Commissioners, December 17, 1980. "Unjustified consumer injury" has been determined to occur where the injury can be substantial, not outweighed by countervailing advantages to the public, and unavoidable by consumers. A-G Foods, Id. If the plaintiff's factual allegations are true, this is certainly an unjustified consumer injury and a substantial "ascertainable loss" under CUTPA. While Connecticut courts have differed on this issue, personal injury has been accepted by many as the basis of a CUTPA claim. See, Haesche v.Kissner, 15 CLT 41 (October 16, 1989, Berdon, J.) Cunningham v.Chainsaws, Unltd, Inc., 4 CONN. L. RPTR. 506 (1991); D'Alfonso v.Jacobs Suchard, Inc., 4 CONN. L. RPTR. 175 (1991); Touchette v.Smith, supra. Cf., Gersich v. Enterprise Rent A Car, 1995 WL 904917 (D.Conn.): Greenberg v. Eli Lilly Co., 12 Conn. L. Trib. No. 19, p. 18 (D.Conn. Feb. 18, 1986) (holding that CUTPA is not designed to provide rights and remedies for personal injury CT Page 6177 cases); Hov. v. Westland, Inc., 4 CSCR 729 (Sept. 28, 1989) (holding that CUTPA is inappropriate for personal injury claims).
The factual allegations of the complaint are therefore sufficient to set forth a claim under CUTPA on which relief may be granted as a matter of law. The motion to strike, to the extent that it is based on the ground of factual insufficiency, is without merit.
 C. The Exclusivity Provisions of the Product Liability Act
Finally, the product liability defendants seek to strike the CUTPA counts based on the "exclusivity" provisions of the Connecticut Product Liability Act:
 A product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product. General Statutes § 52-572n(a). (Emphasis added.)
This provision has frequently led to the striking of common law counts brought in conjunction with product liability claims.Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 471 (1989) (striking the common law counts of product liability since the product liability act provides the exclusive remedy for such claims); Daily v. New Britain Machine Co., 200 Conn. 562, 571
(1986) (holding that the plaintiffs' product liability claim pursuant to § 52-572n was their exclusive remedy, and precluded the assertion of common law theories of product liability). The defendants and the plaintiffs disagree over whether this provision should apply to the statutory cause of action created by CUTPA.
The parties' disagreement is shared by the judges of the superior court, who have been deeply divided over this issue, which has yet to be addressed by the Supreme and Appellate Courts. Cases which have stricken CUTPA claims based on the exclusivity provision include: Hoboken Wood Flooring Corp. v.Torrington Supply Co., 42 Conn. Sup. 153, 156, 5 CONN. L. RPTR. 219 (1991, Blue, J.) (asserting that the legislature intended all product liability claims to constitute a single cause of action);Dinardo v. Coronaverden Atkiebo, 2 CSCR 803 (July 9, 1987, Ryan, J.) (holding that CUTPA is barred by the exclusive nature of the CT Page 6178 PLA); Grieg v. Koehring Construction Equipment Co., 2 CSCR 511
(April 15, 1987, Noren, J.) (stating that a CUTPA claim may not be brought with a claim under the PLA). Cases in which courts have applied a functional equivalency test[1] to preclude any CUTPA claim which asserts the same wrongs and relief sought as the product liability claim include: Pond v. Minwax Co. Inc., 17 CONN. L. RPTR. 418, 2 Conn. Ops. 1001 (September 16, 1996. Wagner, S.J.R.); Londrini v. Brito Enterprises, 9 CONN. L. RPTR. 617 (Sept. 27, 1993, Hendel, J.) (striking the CUTPA count which incorporated allegations of the PLA claim); Estate of Rotman v.Ford Motor Company, 6 CONN. L. RPTR. 117 (March 4, 1992, Burns, J.). Preferred Remodelers, Inc. v. General Motors Corp., 6 CONN. L. RPTR. 118, 1992 WL 48722 (Conn.Super., Rush, J.) ("The allegations of the [CUTPA Count] realleges Paragraphs 1 through 22 of the First Count, alleges fault on the part of the defendants and claims a CUTPA violation"); McCurry v. The HomeDepot, Inc., 12 CONN. L. RPTR. 370, 1994 WL 504102 (Conn.Super., Sylvester, J.) ("The allegations of the CUTPA claim are encompassed in this CPLA claim and seek to address injuries allegedly caused by the same wrongful conduct, i.e., the defendants' failure to adequately and fully inform the plaintiff of the danger to prevent propensities of the hand truck, and the defendants' misrepresentation and nondisclosure of the hand truck's dangerous propensities"); Khongdy v. Die-QuipCorporation, 11 CONN. L. RPTR. 628, 1994 WL 282246 (Conn.Super., Stanley, J.) ("Because there is no functional distinction between the allegations comprising the CUTPA claim and those comprising the product liability claim the Motion to Strike the Second Count of the plaintiff's complaint is granted").
Many of those courts that have not barred a CUTPA claim brought in conjunction with a product liability claim have done so on the basis that the two statutes are designed to protect distinct types of harm and thus address separate claims and redress different wrongs. Cunningham v. Chainsaws Unltd., Inc., 4 CONN. L. RPTR. 506 (Sept. 11, 1991, Susco. J.) (holding that the plaintiff may plead CUTPA in a PLA action because they seek to compensate different harms); Kosowsky v. Sandoz Nutrition Corp.,
4 CONN. L. RPTR. 390, 391 (Aug. 2, 1991, Dorsey, J.) (holding that CUTPA does not involve a product, nor is it a claim for personal injury caused by the making of a product). Where both the CUTPA and product liability claims both redress different injuries, they are not mutually exclusive and the CUTPA claim is not barred. D'Alfonso v. Jacobs Suchard, Inc., 4 CONN. L. RPTR. 175, 176 (May 17, 1991, Aronson, J.). CT Page 6179
Other courts have stressed the statutory nature of the CUTPA cause of action and have determined that the exclusivity provision of the product liability act was designed to preclude only common law causes of action such as negligence, strict liability and the like. Palmieri v. Hi-Way Campers, Inc., 13 CONN. L. RPTR. 535, 1995 WL 94553 (February 27, 1995, Gray, J.);Geib v. Oshkosh Truck Corp., 11 CONN. L. RPTR. 285 (April 4, 1994, Dean, J.): Geissler v. Ford Motor Co., 19 CONN. L. RPTR. 618, 1994 WL 16577 (January 13, 1994. Dranginis, J.); Touchettev. Smith, 10 CONN. L. RPTR. 173, 175 (October 5, 1993, Booth, J.); Cunningham v. Chainsaws Unltd., Inc., 4 CONN. L. RPTR. 506 (September 11, 1991, Susco, J.); Kosowsky v. Sandoz NutritionCorp., 4 CONN. L. RPTR. 390, 1991 WL 151900 (August 2, 1991, Dorsey, J.); D'Alfonso v. Jacobs Suchard, Inc., 4 CONN. L. RPTR. 175 (May 17, 1991, Aronson, J.); Skeritt v. Sandoz NutritionCorporation, 3 CONN. L. RPTR. 433, 1991 WL 60423 (March 26, 1991, Berdon, J.); Haeche v. Kissner, 4 CSCR 718, 719 (August 15, 1989, Berdon, J.); Morrissey v. Toyotomi America, Inc., 3 CSCR 101
(November 27, 1987, Berdon, J.); Collier v. Bridgehaven TruckSales, Inc., 2 CSCR 886 (July 22, 1987, Kulawiz, J.).
The theory of these cases is that because the CUTPA claim at issue in this case is a statutory cause of action. it falls routside the purview of the CPLA. "Clearly . . . claims arising beyond the defined scope of the product liability statute may be asserted as common law actions or pursuant to alternativestatutory provisions." (Emphasis added.) Palmieri v. Hi WayCampers, Inc., 13 CONN. L. RPTR. 535, 1995 Ct. Sup. 1079-0
(February 28, 1995, Gray, J.), citing Burkert v. Petrol Plus ofNaugatuck, Inc., 216 Conn. 65, 73, 579 A.2d 26 (1990). The Connecticut Unfair Trade Practices Act was passed to address "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes, Sec. 42-110b. A deceptive trade practice is one which has "a tendency and capacity to deceive." Federal TradeCommission v. Hires Turner Glass Co., 81 F.2d 362, 364 (3rd Cir. 1935). As stated by Judge, now Justice Berdon:
 It is clear that a CUTPA violation does not come within the purview of CPLA. They are not peas from the same pod, but both acts seek to compensate for different types of harm — CPLA for harm resulting from the defendants' product and CUTPA for harm resulting from the defendants' business practices. CT Page 6180
Haesche v. Kissner, 15 CLT 41 (October 16, 1989, Berdon, J.).See, also, D'Alfonso v. Jacobs Suchard, Inc., 4 CONN. L. RPTR. 175 (1991); Skeritt v. Sandoz Nutrition Corporation, 3 CONN. L. RPTR. 433, 1991 WL 60423 (March 26, 1991, Berdon, J.); Cunninghamv. Chainsaws, Unltd., Inc., 4 CONN. L. RPTR. 506 (1991).
Courts that have upheld CUTPA claims after applying the functional equivalency test to determine whether the CUTPA count "merely incorporates the allegations of the plaintiff's liability claim" include Scovish v. Upjohn Company, 1994 WL 75837 (Conn.Super., Austin, J.) and Geissler v. Ford Motor Co., 10 CONN. L. RPTR. 618, 1994 WL 16577 (January 13, 1994, Dranginis, J.) ("Allegations set forth in the product liability count incorporated by reference into the CUTPA count that are beyond the allegations necessary to support the product liability count, would be sufficient to allow the court to hold that the CUTPA claim is not functionally identical").
In a thoughtful and persuasive recent article, Tropp and Rotondo, "The Preclusive Effect of the Connecticut Product Liability Act on Connecticut Unfair Trade Practice Claims," 70 Conn. B. J. 10 at 333 (October. 1996), the authors conclude that the apparent split in superior court decisions in fact reflects a growing consensus toward an appropriate application of the functional equivalency test first proposed by Judge Nevas.
 The vast majority of courts applying the functional equivalence test have concluded, correctly in the authors' view, that the CUTPA claims in the cases before them were barred by the PLA. Other cases have held, also correctly in the authors' view, that CUTPA claims before them were not barred by the PLA because the specific CUTPA claims were outside the scope of the PLA.
 Nevertheless, three other cases have held,[2] incorrectly in the authors' view, that CUTPA claims were not barred.
Id., p. 343. (Footnote added.)
A correct application of the test, according to the article,
. . . requires one to ask whether the CUTPA claim. CT Page 6181 were it hypothetically brought under the PLA, would be proper. If the CUTPA claim would be proper under the PLA, it is functionally equivalent to a PLA claim.
 Thus, in cases where a CUTPA claim seeks relief (a) other than for personal injury, death or property damage, (b) against persons other than product sellers, or (c) unrelated to harm caused by a product, then the CUTPA claim goes beyond the scope of a proper PLA claim. Such claims should survive the PLA bar.
 On the other hand, if the CUTPA claim includes allegations all of which are appropriate to state a PLA claim, then it is irrelevant whether the claim is also proper under CUTPA. It is likewise irrelevant whether a PLA claim in the case also includes those allegations. If the CUTPA allegations would state an appropriate PLA claim, the CUTPA claim is functionally equivalent functionally equivalent and should be barred.
Id., at 349-50.
Applying this analysis to this case, it is apparent that the claim is for wrongful death against product sellers and is related to the harm caused by the product. All of the allegations of the CUTPA counts are appropriate to a product liability claim, including the added allegations in the CUTPA counts that the defendants failed to communicate with each other, maintain quality assurance and review procedures to ensure that information given to the public was accurate and not deceptive. Thus, the CUTPA counts do not go beyond the product liability claims being made against the same defendants and they are therefore barred by the exclusivity provisions of the product liability act.
Because the product liability act provides the exclusive remedy for harm caused by a product, and because the CUTPA counts in this case are the functional equivalents of the corresponding PLA counts. the CUTPA counts fail to state claims for which relief may be granted as a matter of law. The motions to strike as to those counts, as well as to those portions of the prayer for relief that relate only to those counts, are therefore CT Page 6182 granted.
 II. THE BYSTANDER DISTRESS COUNTS AGAINST THE PRODUCT LIABILITY DEFENDANTS
The Third, Sixth and Ninth counts of the present complaint include the following material allegations:
 26. On October 21, 1994, Shibani Abbhi consumed the danish which contained unlabeled peanuts while at a friend's home. Approximately one-half hour later Seema Abbhi picked her daughter up at the friend's home and first observed her daughter's reaction.
 27. En route from the friend's home, while driving with her mother and siblings in the family car, Shibani's anaphylactic reaction to the danish worsened and became violent and severe. Shibani attempted frantically to use her inhaler as she struggled to breathe and turned blue. Shibani Abbhi's anaphylactic reaction culminated in her death at Greenwich Hospital, approximately two hours after her ingestion of the danish.
 28. The plaintiff, Seema Abbhi, contemporaneously observed, witnessed, sensed and appreciated the injury, pain, suffering, fear and anguish experienced by her daughter as the result of the actions or failure to act of the defendant, through its agents, servants, employees and/or officers, as described above.
 29. As a result of her contemporaneous observance of the decedent's anaphylactic reaction, the plaintiff, Seema Abbhi, suffered and continues to suffer extreme emotional distress, nervous shock and terror.
"Bystander emotional distress" is an action to recover personal emotional damages resulting from witnessing a negligent act which causes immediate and serious injury or death. Clohessyv. Bachelor, 237 Conn. 31 (1996) (recognizing bystander emotional distress as a viable cause of action).[3] Although the Supreme CT Page 6183 Court has not yet discussed whether the Product Liability Act bars a claim for negligent bystander emotional distress, the product liability defendants in this case all contend that such a claim should be barred because the language of § 52-572n
clearly mandates that the Act be the exclusive remedy, "in lieu of all other claims . . . including actions of negligence." They also contend that because the decedent's mother alleges that she witnessed neither the underlying act of negligence by the defendants, nor the moment of ingestion of the allegedly defective product, but rather only their admittedly disturbing aftermath, she has not stated sufficient facts to permit recovery for bystander emotional distress as a matter of law.
Although the Supreme Court has ruled that the product liability act did not bar a plaintiff from bringing a loss of consortium claim in conjunction with a product liability claim, the defendants argue that the court's ruling and rationale does not apply in this case. In Lynn v. Haybuster Mfg., Inc.,226 Conn. 282, 288-89 (1993), the court held that, because loss of consortium was a common law right which existed when the Product Liability Act was passed, and the act does not specify whether a loss of consortium claim survives or is abrogated, the legislature did not intend to eliminate such a claim. Lynn v.Haybuster Mfg., Inc., 226 Conn. 282, 288-89 (1993). The Constitution protects common law or statutory rights from abolition or significant limitation if those rights existed in or before 1818, and the loss of consortium cause of action had been in existence since before 1818 for the husband, and since 1979 for the wife. Id. Thus, the court held that a loss of consortium claim is not barred in an action brought under the Product Liability Act. Id.
In this case, however, the defendants argue that the claim for bystander emotional distress not only did not exist in 1818, but that it was not even adopted in Connecticut until last year. See Clohessy v. Bachelor, supra. Indeed, at the time that the Product Liability Act was passed in 1979, bystander emotional distress had been repeatedly rejected as a viable cause of action. Strazza v. McKittrick, 146 Conn. 714, 719 (1959). See,also, Amodio v. Cunningham, 182 Conn. 80 (1980); Maloney v.Conroy, 208 Conn. 392 (1988). Therefore, when the PLA was enacted, there was no established right to recover damages for bystander emotional distress which to be protected.
Furthermore, the court also stated in Lynn v. Haybuster Mfg.,CT Page 6184Inc., 226 Conn. at 289, that statutes may be interpreted to impair existing interests or change existing law if the language plainly and unambiguously reflects such an intent. As mentioned above in the analysis of the CUTPA claims, the Product Liability Act unambiguously shows the legislature's intent to preclude all other claims of negligence from being brought with a product liability claim. The act specifically states that a product claim "shall be in lieu of all other claims . . . including actions of negligence." C.G.S. § 52-572n(a).
That the plaintiff mother's claim for bystander emotional distress in these three counts is "an action of negligence," however, does not necessarily mean that it is barred by the Product Liability Act. These counts are not brought on behalf of the deceased child, but rather on behalf of the mother, who claims that she sustained damages of her own as the result of bystander emotional distress because of the defendant's defective product. As such, these counts are properly read as reciting product liability claims independent of those asserted by the estate of the deceased child and should not be stricken simply because the child's estate has asserted its own product liability claims. Under the right circumstances, there is no reason why a parent could not bring his or her own product liability claim against a product seller, independent of any claim brought on behalf of the child for harm caused to it, for harm caused to that parent, with bystander distress being the underlying form of negligence asserted as the product liability claim.
Of greater concern, however, is the defendants' contention that the facts alleged in these counts go well beyond the Connecticut Supreme Court's decision in Clohessy v. Bachelor,supra. Indeed, the Court there had recognized that limitations on the bystander emotional distress theory of recovery "are necessary in order not to leave the liability of a negligent defendant open to undue extension by the verdict of sympathetic juries, who under our system must define and apply any general rule to the facts of the case before them." Id. at 51 (internal quotation marks citations omitted). Citing Thing v. La Chusa,48 Cal.3d 668 (1989), the Supreme Court held that in order to properly state a claim for bystander emotional distress, the bystander's emotional injury "must be caused by the contemporaneous sensory perception of the event or conduct that causes the injury." Id. at 52. In that case, the California Supreme Court held that damages may be awarded for "the traumatic emotional effect on the plaintiff who contemporaneously observes CT Page 6185 both the event or conduct that causes serious injury to a close relative and the injury itself." 48 Cal.3d at 667. Here, the plaintiff mother alleges not that she contemporaneously observed the alleged event (ingestion of the Danish) or conduct of the defendant (the mislabelling of the product) that caused the injury, but rather only that she contemporaneously "observed . . . the injury . . . experienced by her daughter."[4] (Third Revised Complaint, Counts Three, Six and Nine, ¶ 28.) The plaintiff seeks to analogize this situation to one in which a pedestrian is struck by a drunk driver and pursues a Dram Shop Claim against the tavern which served alcohol to the driver. There, the "conduct" causing the injury, a bartender serving alcohol to an intoxicated person and the "event" causing the injury, the automobile striking the pedestrian, are not simultaneous occurrences. Nevertheless, the plaintiff is allowed to pursue the claim against the tavern.
A better analogy would be one in which a mother learns that her child has been struck by a car some time after the actual accident. When she arrives to retrieve the child, the child is in moderate distress, but alert and ambulatory. Some time later, the child, who, it so happens, has suffered an aneurysm, collapses and dies in the mother's presence. In the opinion of this court, our Supreme Court would conclude that the mother was too far removed both from the negligent act that caused the accident as well as from the actual injury, even though she was present to see its tragic aftermath. A verdict for the plaintiff under such a scenario would be the kind of "undue extension" of Clohessy based on sympathy against which the Supreme Court has warned.
Here, too, the mother was not present when the actual injury was inflicted on her child, and she was too remote from the act of negligence alleged, the mislabelling of the product, to meet the Clohessy criterion that she "contemporaneously observes both the event or conduct that causes serious injury to a close relative and the injury itself."[5] Thus, although one could conceive of circumstances where a close relative could bring his or her own product liability claim based on bystander emotional distress, this is not such a case.
Another difference between the plaintiff's Dram Shop analogy and the present case, of course, is that the legislature has specifically provided for the Dram Shop action but has made no such provision for situations such as this one, arising out of claims based on product liability. Until and unless the CT Page 6186 legislature so provides, or until the Supreme Court gives a more powerful suggestion than it has heretofore that it is willing to extend bystander emotional distress to a situation where the plaintiff witnesses neither the negligence nor the precipitating event that causes the injury, this court will not provide the expansion of Clohessy which the plaintiff seeks.
The motions to strike these three counts are therefore granted.
 III. THE BYSTANDER EMOTIONAL DISTRESS COUNTS AGAINST THE MEDICAL MALPRACTICE DEFENDANTS
In Counts Fourteen, Fifteen, Sixteen and Seventeen, Seema Abbhi alleges that as the result of medical malpractice by these four defendants, she watched her daughter suffer a severe and violent anaphylactic reaction, in which she was struggling for air, turning blue and dying, and that she was horrified at witnessing her daughter's fatal anaphylactic reaction beyond what a "disinterested" witness could ever be. She contends that she has therefore complied with the criteria for a bystander emotional distress claim as set forth in Clohessy v. Bachelor,supra. The defendant doctors and associated medical practices claim that despite Clohessy, there is no cause of action in Connecticut for bystander emotional distress in medical malpractice cases. In support of this argument, the defendant doctors rely primarily upon two earlier cases which hold that there is no right of recovery for bystander emotional distress resulting from alleged medical malpractice: Maloney v. Conroy,208 Conn. 392, 545 A.2d 1059 (1988) and Amodio v. Cunningham,182 Conn. 80, 438 A.2d 6 (1980).
The plaintiff concedes that the Clohessy court discusses the difficulties associated with bystander emotional distress claims in medical malpractice cases. Specifically, the court noted that ". . . the etiology of emotional disturbance is usually not readily apparent as that of a broken bone following an accident . . . the problem is compounded when the underlying act of negligence with respect to the victim is medical malpractice because there generally is no significant observable suddentraumatic event by which the effect upon the bystander can be judged." Clohessy, 237 Conn. at 44, citing Maloney v. Conroy,supra. She contends, however, that these difficulties are not present in the present case because Shibani's allergic reaction CT Page 6187 was unquestionably significant, observable and sudden, and her mother's emotional distress was painfully immediate and easily traceable to that reaction. She argues that as long as the plaintiff contemporaneously perceives the conduct or event that causes the injury, or views the victim immediately after the injury producing event if no material change in location or condition has occurred, assuming the other three prongs have also been satisfied, there is nothing in Clohessy, which bars the plaintiff from recovering for bystander emotional distress suffered as the result of medical malpractice.
This court need not decide whether an act of medical malpractice could ever give rise to a valid bystander emotional distress claim under Clohessy. For the reasons discussed above in connection with bystander emotional distress claims in the context of product liability litigation, the facts alleged by the plaintiff are insufficient to satisfy the second prong of theClohessy test. She has not alleged that she witnessed the acts of negligence or that she was present at the event that caused her child's death, the ingestion of the Danish pastry. She argues, without citing any authority, that she is still entitled to pursue this claim if she views the victim immediately after the injury producing event if no material change in location or condition has occurred, but, in fact, her own allegations are to the effect that she first viewed the child in a location other than that at which the injury causing event occurred, and that the child's condition had changed, for the worse, since that event.
It is true that many of the emotional distress cases cited by the Supreme Court in Clohessy v. Bachelor involve fact patterns in which the actual act of negligence was not observed by the claimant. See, Tommy's Elbow Room, Inc. v. Kavorkian,727 P.2d 1038 (Alaska, 1986) (Accident victim's father entitled to jury instruction on negligent infliction of emotional stress, where father sees the accident on his way home, learns that his daughter was involved in the accident when he arrives at home, returns to the scene of the accident and observes his daughter);Lejeune v. Rain Branch Hospital, 556 So.2d 559 (La., 1990) (wife recovers for bystander emotional distress suffered when she discovered that her hospitalized, comatose husband incurred rat bites sometime in her absence); Portee v. Jaffee, 84 N.J. 88,417 A.2d 521 (1980) (Mother observes death of son wedged in negligently maintained elevator). Although the plaintiff views these citations as evidence that the Supreme Court contemplated CT Page 6188 that bystander claims might be viable even if the actual act of negligence was not witnessed, this interpretation is undermined by the fact that, although aware of these cases, the Supreme Court specifically included this requirement as part of the second prong of its test. Under these circumstances, the absence of an allegation that the plaintiff witnessed the negligent conduct is fatal to her bystander distress claim, as is the failure to allege that she witnessed the event itself, the ingestion of the Danish.
The motions to strike these counts are therefore granted.
 IV. THE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS COUNTS AGAINST THE MEDICAL MALPRACTICE DEFENDANTS
In Counts Eighteen, Nineteen, Twenty and Twenty-One, Seema Abbhi claims that the acts of the defendants that form the basis of her daughter's estate's medical malpractice claims also constitute negligent infliction of emotional distress upon her as the child's mother. Specifically, Seema Abbhi claims that she consulted with the defendant doctors and/or members of their associated medical practices for the purpose of receiving advice, instruction, and consultation concerning her daughter's peanut allergy and asthma. Further, She alleges that as Shibani's caregiver and guardian, the individual who would be responsible for carrying out and overseeing the physicians' instructions, she was in a patient/doctor relationship with these physicians who owed her a duty of due care. She also alleges that the physicians and/or members of their associated medical practice knew or should have known that their alleged failure to properly instruct, advise and consult with her involved not only an unreasonable risk of harm to her child, but also an unreasonable risk of distress to Seema if that harm were caused. She asserts that when her daughter did, in fact, experience an anaphylactic reaction to peanuts, she, Seema, was helpless to respond because the physicians had inadequately advised and instructed her, and that, as a result, she suffered and continues to suffer extreme emotional distress. She therefore contends that she has alleged the necessary elements of a negligent infliction of emotional distress claim under Montinieri v. Southern New England TelephoneCompany, 175 Conn. 337, 341, 398 A.2d 1180 (1978).
Several Superior Court cases in Connecticut, subsequent toMaloney v. Conroy, supra, have recognized emotional distress CT Page 6189 claims for mothers who have witnessed injury to their children as a result of medical malpractice. See, e.g., Scalise v. BristolHospital, 14 CONN. L. RPTR. 534, 1995 WL 410751 (July 5, 1995, Corradino, J.); Hall v. Mt. Sinai Hospital, 8 CONN. L. RPTR. 262,8 CSCR 185 (1993); Hyland v. State of Connecticut, 7 CONN. L. RPTR. 222 (1992).
In Casner v. Fine, No. 94-0462895, 14 CONN, L. RPTR. No. 18, 570 (Conn.Super. May 22, 1995) (Handy, J.), the court noted that "a distinction is recognized between claims for bystander recovery and claims for negligent infliction of emotional distress based on the breach of a direct duty owed to the plaintiff-mother by virtue of the physician-patient relationship. " Id., citing Starr v. Merdinolu 2 CONN. L. RPTR. 714 (November 1, 1990, Cioffi, J.). In Casner, the plaintiff mother alleged negligent infliction of emotional distress based on the physician's failure to properly treat and advise her concerning her pregnancy, which resulted in her antibodies' attacking her infant's immune system in utero. Judge Handy denied the defendant's motion to strike this claim holding that the mother "was not a bystander under these facts."
The defendants here have moved to strike these counts based on their contention that because of the absence of a doctor-patient relationship between them and Seema, as opposed to Shibani, they owed Seema no duty upon which damages for negligent infliction of emotional distress could be premised. They therefore urge the court to find that she has failed to state claims for which relief may be granted as a matter of law.
In an action for negligent infliction of emotional distress, a plaintiff must show the necessary elements of negligence.Montinieri v. Southern New England Tel. Co., 175 Conn. 337, 341
(1978). "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." RK Constructors, Inc. v. FuscoCorp., 231 Conn. 381, 384 (1994). The focus of their present motion is their contention that their duty was to their patient, Shibani, and that, although they deny any negligence, the only entity to which they could be liable for negligence is Shibani's estate. Although a duty of care from a physician to a parent has been found in the childbirth cases previously mentioned, they contend that there is no such duty under the circumstances of this case. CT Page 6190
For example, while "the defendant's malpractice breached a duty owed to [the mother] by virtue of the physician-patient relationship," permitting the mother to recover for emotional distress arising from injury to her child during childbirth,Heland, supra. 7 CONN. L. RPTR. at 223, such cases, rather than suggesting the existence of a general duty to any parent arising out of the medical care of a child. demonstrate that in Connecticut a doctor-patient relationship does not exist between a parent and physician caring for a child unless the parent also receives some actual medical care or attention. "[T]o infer that a mother is a bystander at the birth of her infant manifests a basic misunderstanding of the duty owed a patient by a physician. In such circumstance . . . there are two within the zone of danger and the doctor owes a duty to each . . ." Id. The mother's special status as co-patient begins to change, however, at a point after delivery when she is no longer in the "Zone of danger."
The plaintiff suggests that to allow emotional distress claims where the child is in utero, but not following birth, "creates an artificial distinction between antenatal and postnatal concern, responsibility and involvement of a mother toward her child and manifests a basic misunderstanding of the relationship between mother and child, the closest and most precious of relationships." See, Doe v. Cuomo, 43 Conn. Sup. 222
(Oct. 25, 1995, Lavine, J.). The distinction, however, is not so much based on whether the child is in or out of the womb as it is on whether the parent is a recipient of the physician's care. While the child is in utero, the mother as well as the unborn child are the subjects of the physician's duty. Although under some circumstances the doctor-patient relationship with the mother, and hence the duty toward her, may continue for a period of time after birth, depending on the mother's condition, at some point it becomes apparent that only the child is the patient. Indeed, no claim is being made here that any of the medical malpractice defendants were actually providing medical care and treatment to Seema Abbhi at any time pertinent to allegations of this complaint. Seema does assert that when she sought the advice of these defendants, and they undertook to advise and guide her, a duty was established, but she provides no support for this legal proposition other than to state that "it is indisputable that Shibani Abbhi could, even would, suffer a fatal anaphylactic reaction if the defendant physicians failed to adequately advise, inform, and instruct her mother and her concerning her peanut allergy and that Seema Abbhi would be emotionally devastated CT Page 6191 should this reaction occur. Accordingly, the harm suffered here was certainly foreseeable." This contention is not sufficient to establish that the duty owed by these defendants ran to her in addition to her daughter.
To the extent that these counts are "an attempt to semantically evade the strictures of" Maloney v. Conroy,208 Conn. 392 (1988), See, Hlavaceck v. Bridgeport Hospital, 1996 WL 150435 (Conn.Super. March 6, 1996) (Ballen, J.), by turning an impermissible bystander distress claim into one sounding in negligent infliction of emotional distress, they are unacceptable. See, also, Scalise v. Bristol Hospital, supra ("it would be difficult to contemplate the rationality of a jurisdiction which would deny recovery under the holding ofMaloney to a father in this situation if he labeled his action as one for bystander emotional distress but then allow recovery to the same type of injury when he put a different label on his claim — negligent infliction of emotional distress").
This court is aware that in ruling on a motion to strike, it should consider evolving law and not prematurely preclude claims which have not been reviewed or decided by the Supreme Court. "The purpose of a Motion to Strike is to test the legal sufficiency of the allegations of a Complaint and one of the recognized purposes is to test whether our state is `ready to recognize some newly emerging ground of liability.'" Scalise v.Bristol Hospital, supra, quoting Durham Agreduct Co. v. C.E. BurrR. Co., 8 Conn. Trib. 13, p. 11, 12 (1988); see, 1 Stephenson, Connecticut Civil Procedure, Section 116. Nevertheless, based on a fair reading of the indications given to date by the Supreme Court,[6] this court is not persuaded that the Supreme Court is about to recognize liability for negligent infliction of emotional distress under the circumstances alleged in these counts.
The motions to strike Counts Eighteen, Nineteen, Twenty and Twenty-One are therefore granted.
The death of Shibani Abbhi is surely a tragic event, but if the estate is able to prove its product liability and/or medical malpractice claims against the respective defendants, appropriate remedies will be available to it. Those remedies do not, however, include damages based on CUTPA, nor, under the circumstances of this case, do they include damages for bystander distress or negligent infliction of emotional distress on Seema Abbhi. The CT Page 6192 motions to strike, therefore, are each granted in their entirety.
SILBERT, J.